**WAVE MAKER SHIPPING CO., LTD.,**

v.

**HAWKSPERE SHIPPING CO., LTD.**

No. CIV.A. WMN–00–3408.

United States District Court, D. Maryland.

Dec. 3, 2001.

John H. West, III, Baltimore, MD, for Wave Maker Shipping Co., Ltd.

Geoffrey S. Tobias, Donald C. Greenman, Ober Kaler Grimes and Shriver, Baltimore, MD, for Hawkspere Shipping Co., Ltd.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court is the motion of Claimant Clipper Bulk Shipping, Ltd. ("Clipper Bulk") to vacate attachment (Paper No. 40). The issues have been fully briefed, and a hearing was held on November 16, 2001. After consideration of the pleadings and oral argument presented at the hearing, the Court determines that Clipper Bulk's motion will be denied.

## I. BACKGROUND

This admiralty action began as a rather simple dispute between Plaintiff Wave Maker Shipping Company ("Wave Maker") and Defendant Hawkspere Shipping Company, Ltd. ("Hawkspere"), and since has grown in both size and legal complexity. The case arose out of a breach of contract claim lodged by Wave Maker against Defendant for failure to pay the hire and other expenses incurred by Defendant in its charter and operation of the ship TITANAS from June 5, 2000 until August 9, 2000. At the time the Complaint was filed, damages were estimated to be approximately $40,000. The terms of the charter dictated that all disputes arising between Wave Maker and Hawkspere were to be decided by arbitration in London. Wave Maker was also entitled to seek the attachment of Hawkspere's property to secure any award made in its favor against Hawkspere. Accordingly, on November 16, 2000, Wave Maker filed suit in this Court, seeking to attach what Wave Maker claims to be property of Hawkspere, namely, the fuel oil and diesel oil ("bunkers") aboard the NOBILITY, a ship that had been chartered by Hawkspere and was docked in Baltimore Harbor at that time.

The bunkers aboard the NOBILITY were attached pursuant to an Order issued by this Court on November 16, 2000. Paper No. 5. At the time of the attachment, the NOBILITY was owned by Clipper Bulk, which had chartered the NOBILITY to Hawkspere on or about October 10, 2000 for a voyage from the Baltic to the east coast of the United States. The

Charter Party between Clipper Bulk and Hawkspere provided that the contract was to be governed by English law. The NOBILITY remained on charter to Hawkspere until redelivery to Clipper Bulk on or about November 30, 2000.

On November 21, 2000, Clipper Bulk responded to the attachment of the bunkers and sought to have it dissolved, claiming that Clipper Bulk-not Hawkspere-was the owner of the bunkers, and thus that the attachment was improper. At a hearing held before this Court on the following day, the motion to vacate the attachment was denied, but Clipper Bulk was granted the opportunity to bring the motion again at a later date, upon further evidence as to the ownership of the bunkers.

Shortly after the November, 2000, hearing, two intervening plaintiffs entered the case. Estonian Maritime Agency, Ltd. ("Estonian") claimed damages of $17,597.24 for agency services rendered to Hawkspere during its charter of another ship. Poseidon & Frachtcontor Junge, Ltd. ("Poseidon") sought damages of $32,452.81, as a result of agency services rendered to Hawkspere during its charter of yet another ship.

On November 30, 2000, pursuant to an order of this Court, Clipper Bulk posted a general bond in order to release the bunkers and the NOBILITY. The bond promised to pay any final judgment that may be rendered in favor of Plaintiff or Intervening Plaintiffs, against Hawkspere, in amounts not to exceed a total of $57,163.90, which was the stipulated value of the bunkers that had been attached. It is this bond which Clipper Bulk now seeks to vacate or, in the alternative, to reduce in amount.

In accordance with the terms of the charter party for the TITANAS, Wave Maker and Hawkspere entered arbitration in London. On March 30, 2001, the arbitrator awarded Wave Maker the amount of $41,752.87, plus interest.[1] On July 18, 2001, this Court entered default judgment against Hawkspere and in favor of Wave Maker for that amount. Paper No. 50. This Court also entered default judgment in favor of Poseidon and against Hawkspere in the amount of $33,618.08, plus daily prejudgment interest of $4.39 per day from July 18, 2001 to the date of judgment. Paper No. 52. Default judgment was also entered in favor of Estonian and against Hawkspere in the amount of $17,597.24, with interest at a rate of 8% per annum from October 1, 2000. Paper No. 56.

## II. LEGAL STANDARD

■ Supplemental Rule B of the Federal Rules of Civil Procedure authorizes the attachment of property in certain maritime actions. When the validity of an attachment is challenged, the burden is on the plaintiff to show why the attachment should not be vacated. See, Fed.R.Civ.P. Supp. R. E(4)(f). In the present case, then, Wave Maker[2] bears the burden of proving that the bunkers in question were property of Hawkspere at the time of attachment.

## III. DISCUSSION

■ The key question in this case is whether, under English law, Hawkspere would be deemed to be the owner of the bunkers at the time they were attached on November 17, 2000. Clipper Bulk seeks to vacate the attachment on the grounds that

1. The award is final and not subject to appeal or modification.

2. Hereinafter, Plaintiff and Intervening Plaintiffs will collectively be referred to as Wave Maker.

it, and not Hawkspere, owned the bunkers. Clipper Bulk advances two theories to support its argument. First, Clipper Bulk contends that although Hawkspere initially purchased the bunkers on board the NOBILITY at the start of its charter period, Hawkspere subsequently "sold back" the bunkers to Clipper Bulk, mid-charter. Second, Clipper Bulk argues that the majority of bunkers on board the NOBILITY at the time of attachment consisted of fuel supplied to the ship in Russia, for which Hawkspere never paid and to which it never took title. The Court will address these arguments, *seriatim*.

### A. The Mid–Charter "Sell-back" of Bunkers to Clipper Bulk

It is undisputed that at the outset of its charter with Clipper Bulk, Hawkspere paid for and took ownership of the quantity of bunkers then on board the NOBILITY. Specifically, Hawkspere paid Clipper Bulk $51,337.70 for approximately 230 metric tons of intermediate fuel oil (IFO) and approximately 56 metric tons of Diesel fuel (MDO), on or about October 16, 2000. This purchase was in accordance with the terms of the Charter Party, which states in pertinent part:

Clause 2:

"That whilst on hire the Charterers shall provide and pay for all the fuel ..."

Clause 34:

"It is also agreed that from the hire payment(s) estimated Owners' disbursements and estimated value of bunkers on redelivery may be deducted from the hire."

Clause 38:

"Charterers on delivery and Owners on redelivery to take over and pay for all bunkers remaining on board. Vessel to be delivered with bunkers as on board estimated to be about 200/300 mt IFO and about 40/70 mt diesel oil. Vessel to be redelivered with about the same quantities as actually on board on delivery. Prices at both ends to be US$155 per metric tonne for IFO and US$280 per metric tonne for diesel oil."

The Charter Party also provided that Hawkspere was to make payments for hire and other expenses to Clipper Bulk every 15 days. On or about October 30, 2000, while still on charter, Hawkspere submitted to Clipper Bulk a 15–day account statement, which showed that Clipper Bulk was owed approximately $95,800.00. On the statement, Hawkspere attempts to deduct from this amount the "bunkers on redelivery," the value of which Hawkspere lists as $51,337.70. After deducting some owners' expenses, Hawkspere's statement indicates that it paid Clipper Bulk in cash for the balance, in the amount of $35,655.32. *See,* Clipper Bulk's Mot. at Ex. D2. Clipper Bulk claims that this accounting statement is evidence that Hawkspere transferred title to the bunkers back to Clipper Bulk.

Clipper Bulk initially argues in its Motion to Vacate that the mid-charter bunker sale was authorized under Clause 34 of the Charter Party, which allows the "estimated value of bunkers on redelivery" to be deducted from the hire. An affidavit submitted several months later by Clipper Bulk's English law expert, John Flaherty, however, does not cite Clause 34 or any other provision of the contract as authority for the transaction. In fact, Mr. Flaherty agrees with Wave Maker's expert, Mr. Heene, that unless the terms of the Charter Party had been subsequently modified by the parties, "Hawkspere would retain title to the bunkers until the vessel was redelivered to Clipper Bulk in accordance with the terms of the charterparty." Flaherty Aff. at ¶ 6. Given that Clipper Bulk's own expert apparently disagrees

with the Clause 34 argument, the Court need not address it and will instead turn to the question of whether Clipper Bulk and Hawkspere successfully modified the Charter Party.

English law provides no direct authority concerning an attempted mid-charter transfer of ownership in bunkers.[3] Principles of English contract law, however, counsel against giving effect to such a transfer. For the most part, Clipper Bulk and Wave Maker share the same understanding of English contract law, which applies an objective test as to whether the parties to a contract agree to vary its terms. An enforceable variation requires a firm offer, an acceptance, certainty of terms, and consideration. *See,* Flaherty Aff. at ¶ 7; Heene Aff. (I) at ¶ 10. Furthermore, "it is axiomatic that a party cannot unilaterally vary the terms of a contract; there has to be acceptance of the variation of the contract; that acceptance being more than 'mental acceptance or mere acquiescence'." *Wilken & Villiers on Waiver, Variation, and Estoppel* (1998 edition) at 15 (as quoted in Heene Aff. (I) at ¶ 12). The treatise also explains that "a party's agreement must be freely given and when the consent is obtained as a result of duress, it will be of no effect." *Id.*

Based on the evidence before the Court, Hawkspere's purported "sell-back" of the bunkers to Clipper Bulk lacks these objective indicia of a valid variation to the contract. First, it is doubtful whether Hawkspere's deduction of the bunkers on its October 27, 2000, accounting statement constituted an offer. Rather, Hawkspere made a unilateral decision to breach the terms of the charter by attempting to sell back the bunkers long before redelivery of the ship. The October 27 accounting adjustment merely reflected Hawkspere's breach.

Second, even assuming that Hawkspere did make a proper offer, Clipper Bulk has failed to demonstrate valid acceptance of the offer. Clipper Bulk's affiant, Mr. Flaherty, accurately points out that acceptance may be made by oral representations or conduct alone, as long as they are such "as to induce a reasonable person to believe that he intends to be bound." Flaherty Aff. at ¶¶ 8–10, quoting *Chitty on Contracts* (Vol. 1, General Principles 28th Edition). In response to Hawkspere's accounting statement, however, Clipper Bulk merely agreed not to exercise its right to withdraw the vessel from the charter party or take other steps to enforce the debt. Mr. Flaherty equivocally states that in doing so, Clipper Bulk "probably" demonstrated its acceptance. Flaherty Aff. at ¶ 12. As Wave Maker's affiant points out, however, this tentative assertion, taken to its logical conclusion, would mean that when a party to a contract breaches and the innocent party does not commence immediate proceedings to enforce its rights, the unilateral action is transformed from a breach into a valid variation. Clipper Bulk has not provided any legal authority to support such a proposition.[4]

---

3. Indeed, the parties have been unable to cite a single case from any jurisdiction in which such a transaction is described, much less approved.

4. Clipper Bulk also offers no support for the argument that its acceptance was valid because Clipper Bulk was forced to "make the best of a bad situation." Clipper Bulk's Mot. at 8. While the Court recognizes that Clipper

Bulk may have had to choose the lesser of two evils, English law does not permit a bad situation to transform a breach into a valid transfer of title. Quite the contrary, English law requires that an agreement to vary terms be "freely given." *See, Wilken & Villiers on Waiver, Variation, and Estoppel* at 15 (as quoted in Heene Aff. (I) at ¶ 12).

Because the mid-charter sale of the bunkers was not authorized by the terms of contract, and because English law does not recognize the purported modification of the charter party, the purported sale is invalid. Although the Court need not reach the issue, it is worth noting that the mid-charter sale would likely fail to meet another requirement of English law, that the goods be ascertainable before title can pass. *See* Heene Aff. (II) at ¶¶ 11, 12 (citing the British Sales of Goods Act of 1979). Hawkspere attempted to transfer title to "bunkers on redelivery," even though redelivery did not occur until approximately a month later. Accordingly, it appears that even if Hawkspere's accounting adjustment were found to be a valid contract modification, title in the bunkers would not have passed until redelivery of the NOBILITY, which occurred well after the attachment.

*B. Ownership of the Bunkers Supplied in Russia*

Clipper Bulk also argues that most of the bunkers on board at the time of attachment consisted of IFO and MDO that had been supplied in Russia, to which Hawkspere allegedly never took title. Accordingly, Clipper Bulk argues that even if the alleged "sell-back" is deemed invalid, the Court should find that only the small amount of non-Russian bunkers on board at attachment is property of Hawkspere and subject to attachment.

On October 24, 2000, early in the charter period, Hawkspere docked the NOBILITY in St. Petersburg, Russia, where approximately 350 metric tons of IFO and 50 tons of MDO were taken on board.[5] The IFO was segregated from the IFO already on

board that was being used, and the MDO was mixed with the on-board MDO. As the ship traveled across the Atlantic Ocean, it first burned the "old" IFO, following a "first in, first consumed practice." *See,* Clipper Bulk's Mot. at 12. When the NOBILITY arrived at Baltimore Harbor, it had used up all the original IFO and almost 100 metric tons of the Russian IFO. Clipper Bulk's uncontested calculations also show that of the MDO remaining on board at Baltimore, only about 28 metric tons (worth approximately $8,000) was *not* from the Russian bunkers.

It is undisputed that the supplier of the Russian bunkers was Baltic Bunkering Company ("Baltic"). There is not agreement, however, as to the identity of the seller and the terms of the sales contract.[6] Clipper Bulk argues that Baltic was the seller of the bunkers, and therefore that its contract, the Standard Marine Fuels Purchasing Contract ("FUELCON") governed the transaction. Since Wave Maker has presented no evidence to the contrary, the Court will assume, *arguendo*, that the FUELCON contract controls.

Clause 11 of FUELCON states in pertinent part:

"Title to the Marine Fuels shall pass to the Buyers upon payment for the value of the Marine Fuels delivered, pursuant to the terms of Clause 9 hereof. Until such payment has been made, the Sellers shall have a right of lien over the Marine Fuels delivered."

Clause 9 states, in part:

"Payment for the Marine Fuels shall be made by the Buyers within the number of days stated in Box 14 after the com-

---

**5.** All fueling calculations for the NOBILITY are uncontested.

**6.** This issue arose in a related case, *Loginter S.A. Y Parque Industrial Agua Profunda S.A.*

*Ute, et al. v. M/V NOBILITY,* WMN–00–3448, but its resolution was not necessary to the outcome of that case.

pletion of delivery or ten (10) running days after the date of the Sellers' invoice, whichever is the later."

Clipper Bulk's Mot. at Ex. D8.

The evidence concerning the due date for Hawkspere's bunker payment is somewhat conflicting. It seems clear, however, that payment became due after November 16, 2000, the date of attachment.[7] Clipper Bulk argues that the due date is irrelevant, and that the bunkers never became property of Hawkspere because payment was never made. The English law on bunker ownership, scanty as it is, undermines this assertion, however, as does the language of the charter party for the NOBILITY.

As mentioned above, it appears that no English cases have addressed a mid-charter sale of bunkers from a charterer back to a shipowner. One case, however, has examined bunker ownership in light of contract terms almost identical to those terms in the Clipper Bulk/Hawkspere charter party that concern bunker ownership. In the *SPAN TERZA*, 1 Lloyds Rep. 119 (1984), the House of Lords interpreted the charter clause, "[t]hat the Charterers, at the port of delivery, and the owners, at the port of redelivery, shall take over and pay for all fuel remaining on board the vessel," [8] to be "wholly inconsistent with the property in the bunkers being vested in anyone other than the charterers." Id. at 121. The House of Lords later concludes that, "[u]nder the terms of the charter party, the bunkers while aboard Span Terza were at all material times the property of the charterers; the shipowners had possession of them as bailees of the charterers." *Id.* at 122–23. In the present case, as of the time of attachment, Hawkspere had purchased the Russian bunkers as required by the terms of the charter; Hawkspere had not yet redelivered the ship to Clipper Bulk and was still operating under the charter; and the due date for payment on the Russian bunkers had not yet arrived. Under the principles of the *SPAN TERZA* case and according to the terms of the charter, the Court finds that the Russian bunkers were property of Hawkspere when attached.

## IV. CONCLUSION

For the foregoing reasons, Clipper Bulk's Motion to Vacate Attachment will be denied. It appears that the resolution of this motion resolves this case. The Court notes, however, that the combined total of the damages awarded to Plaintiff and Intervening Plaintiffs exceeds the amount of the bond. Accordingly, the parties shall submit a joint proposal for the disbursement of funds from the bond. A separate order will issue.

---

**7.** A confirmation memo received by Hawkspere's agent, Serac, a few days prior to the bunker delivery, indicates that payment will be due within 30 days from the date of delivery, which would be November 24, 2000. Clipper Bulk's Mot. at Ex. D4. A memorandum from Serac indicates that no invoice for the bunkers was received until November 23, 2000. *Id.* at Ex. D5. A facsimile from Baltic on November 28, 2000 requests payment from Hawkspere by "week 49," presumably the first week in December, 2000. *Id.* at Ex. G.

**8.** This language is almost identical to Clause 38 in the Clipper Bulk/Hawkspere charter party.